MOBILE, JACKSON & KANSAS CITY RAILROAD COMPANY *v.*
LUTHER KRANFIELD.

[46 South., 71.]

DAMAGES. *Excessive. Railroads. Ejection from train. Passenger.*

Where the plaintiff, a passenger, was ordered in profane terms to
leave a railroad train at a station by an employe of defendant
railroad company, the words not being heard by any third per-
son, and he did not sustain great shock by reason of the ejec-
tion or the manner in which it was effected, his recovery should
not exceed seven hundred and fifty dollars.

FROM the circuit court of, second district, Choctaw county.
HON. J. T. DUNN, Judge.

Kranfield, appellee, was plaintiff in the court below; the rail-
road company, appellant, was defendant there. From a judg-
ment for $2,500 in plaintiff's favor defendant appealed to the
supreme court. The facts are stated in the opinion of the court.

*May, Flowers & Whitfield,* for appellant.

The verdict of the jury is excessive. The court will note that
this case was tried before Code 1906, § 4910, was declared by
this court to be unconstitutional. The trial judge did not think
he had the power to set aside this verdict or the right to reduce
it.

When it is remembered that this plaintiff was not really
ejected from a train but was refused admission only; that he got
off the train at his home and at the station; that it was a clear
day about four o'clock in the afternoon; that he is a man of the
world, able to take care of himself anywhere; that he was not
touched; that if he had talked with anybody it was only a subor-
dinate whom he knew not to be the proper person to decide
whether he should proceed on the train; that he sought no fur-

ther light although the conductor was on the ground and the plaintiff knew the conductor was the man to whom he should apply; that he was not even cursed according to his own testimony, but some profane language was used in the conversation with him; that he was not specially disturbed about it and made no mention of it to anybody at the time; that whatever was said to him by the railroad man no one heard it but Kranfield; that their conversation was in such low tones that the people only a few feet away did not hear it; that he went at once and got his ticket cashed and proceeded by private conveyance to his destination—when all these things are considered, this court will wonder, as counsel on both sides did and as the circuit judge did at the trial, how any jury in the land could have figured out a twenty-five hundred dollar verdict. It is outrageously excessive under any view of this case. And the court will further take into consideration the extreme thinness of the thread upon which the plaintiff's case hangs. His story was so very unreasonable; the wrong complained of was so very small even upon the plaintiff's own statement of the facts.

In *Alabama, etc., Ry. Co.* v. *Livingston,* 84 Miss., 1, 36 South., 256, it appeared that Livingston had taken a train at Forest which a railroad man had told him carried passengers. He seems to have made a mistake. He said that Busten, who was track supervisor of defendant's road, told him that the train which he boarded carried passengers. Acting upon this information, he boarded the train and was put off between stations; and as he said in an abusive and insulting way by the conductor. He was put off at night and had to walk back. He recovered judgment for two thousand dollars, and this court said the verdict was excessive and required him to remit one thousand dollars. The facts of that case were much more aggravated than those in the case at bar whatever view may be taken of it. It would be difficult indeed to find warrant for using different measures of damages in the two cases simply because Kranfield

had a ticket sold him under mistake and Livingston was on a train under an honest mistake. Kranfield says he thought he had the right to ride; Livingston thought he had the same right. One had a ticket; the other was acting under verbal instructions. In the Livingston case there was no doubt as to the authority of the man or in the identity of the man, the employe of the company who made the ejection. In the case at bar we have an unknown, undescribed, unidentified "fellow" whom plaintiff had not seen before and has not seen since, the character of whose employment is not known. The verdict of this case can be nothing more nor less than the result of prejudice or thoughtlessness.

*Alexander & Alexander* and *George B. Power,* for appellee.

In determining whether the verdict is excessive, regard must be had to the plaintiff's testimony alone, for it is manifest that the jury believed plaintiff and fixed the amount in the light of what is considered was defendant's duty to the public; or, as the instruction directed it "by way of punishment to compel defendant to have due regard for the rights of the public." The treatment of the travelling public by crews of trains is a matter of vital concern to the jury, composed of representative men from the county, and they are in a better position to judge as to what in the conduct of a common carrier stands most in need of correction and punishment. It must be assumed that the jury knew enough of the frequency or recurrence of acts like this to decide what punishment ought to be inflicted. The jury having been properly charged as to the right to inflict punitive damages and the consideration which should guide in so doing, we do not think this court will condemn the verdict as excessive. Larger verdicts in cases somewhat similar to this have recently been affirmed by this court.

In the case of *Yazoo, etc., R. R. Co.* v. *Nichols,* a verdict in favor of a colored woman for $3,000 was sustained on the

strength of her own testimony, though flatly contradicted by three or four influential white men, where the wrong done was the refusal to exchange her ticket, accompanied by words of profanity.

Ever since Judge CAMPBELL, some twenty years ago, stated in an opinion that brusqueness was not equivalent to insult, many wilful, wanton, harsh and oppressive acts and words of railroad employes have been characterized as "mere brusqueness." The contention, however, has reached its limit in this case, for if the language used by this flagman is mere brusqueness, we are curious to know where profanity and insult begin, and what are their true limit.

We respectfully ask the court to give some definition to this overworked word "brusqueness."

The statement or suggestion in the brief of counsel for appellant that the judge considered that it was beyond his power to set aside the judgment on the ground that it was excessive is not sustained by anything in this record. There is no proof on the subject and cannot be, and it would not be fair and right to appellee to act on such suggestions and carry the counsel and the court outside the record.

Argued orally by *J. N. Flower*, for appellant, and by *C. H. Alexander*, for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

This suit sounds in tort, and must be viewed as an action to recover punitive damages for the willful and wanton expulsion of the appellee from the train of appellant. Since it is a suit in tort for punitive damages, all that is said in the briefs on either side about the annulment of the train, and about the refusal of the second and third instructions asked by the defendant with respect to the annulment of the train, may be put wholly out of view, since those instructions, and all that is said, one way or the other, about the annulment of the train, have nothing whatever

to do with the real point in issue—whether the railroad company is liable for punitive damages on account of the manner of the expulsion of the plaintiff from the train.

It is most earnestly insisted, and very strongly and persuasively argued, that this is a sham suit, and that there is no liability on the part of the railroad company, and that this appears from the fact that some of the material allegations of the original declaration were manifestly unfounded, and admitted to be so, on cross-examination, by the plaintiff himself. We cannot accept this view. It was for the jury to pass upon the testimony of the plaintiff, and, whatever may be the objections that may be pointed out to parts of that testimony, it cannot be said that the jury were not warranted in believing it to be substantially true. It is perfectly clear from plaintiff's testimony that the assistant ticket agent of the railroad company sold him a ticket from Louisville to Ackerman, and gave him no notice of the annulment of the train, although the agent well knew of that fact. It is true that when he got off the train his money was refunded and he delivered up the ticket, and this ended the contract relation between the plaintiff and the carrier; but all this is beside the real point, which is, as stated, whether the conduct of the flagman or brakeman, whichever he was, in putting the plaintiff off, was so willful and wanton as to warrant the imposition of punitive damages. The plaintiff himself admits frankly that there was no loud talking by the flagman or brakeman; that the flagman or brakeman did not curse him directly, nor abuse him. He says, in fact, that they talked in so low a tone that he did not suppose anybody else except himself heard what the brakeman said, not even persons sitting in immediate nearness to him in the coach. This certainly is an extraordinary statement—one hard to credit—but one which the jury did credit, and which we cannot say they were without warrant in crediting.

Coming to the specific language used, upon which the propriety of this verdict must turn, it is thus stated by the plaintiff.

In fact, he makes two statements about it not entirely in accord. He says: "I started in and got on the back end of the platform, and started in to get a seat, and a fellow there says: 'Where are you going?' I says: 'I am going to Ackerman.' And he says: 'I don't reckon you are going on this train.' And I says: 'Why?' And he says: 'Because you can't go. I said you couldn't go, and that is enough.' And I says: 'I've got some particular business in Ackerman. I've got to go.' And he says: 'You can't go on this train. Get off.' And I says: 'Well, I don't see why. I've got a ticket.' And I showed him my ticket, and I says: 'The agent told me I could go on this particular train, and I've got to go.' And he says: 'You can't go. Get off.' And I says: 'Well, I can't see why.' And he says: 'That's enough, God damn it. I said get off.' And I says: 'All right. I don't want to have any trouble with you, but I want to go to Ackerman.' He says: 'By God, you can't go. Get off.' And I got off the train." It will be observed here that, when he first makes the flagman or brakeman say, "Get off," he twice gives the language in simply that form, "Get off," without any profane additions, and it is only at last that he makes these additions. Again, in his cross-examination he states as follows, after having first stated that he did not know what officer it was, or employe, who put him off, that he did not think it was the conductor, that he thought it was a brakeman, and that he had never seen him before or since: Referring to the language used by the flagman or brakeman, he says: He [*i. e.,* the flagman] says: 'By God, you can't go. God damn it, get off here." It must be conceded, on the one hand, that this passes any bounds to be embraced by mere "brusqueness," whatever may have been the meaning of that word as once used by this court. But it must also be said, in fairness and justice to the railroad company, that the testimony of this plaintiff is so remarkable—comes in such a questionable form—that it should not particularly commend itself to a fair-minded jury. He admits that in talking about this wrong to his stepfather he never told him a word about the curs-

ing or abuse, but simply that he had been made to get off.    A
Mr. Fox, who was present, states that he saw him get off of the
front end of-the train, and that in a conversation with him, im-
mediately upon his getting off, he never said a word about any
cursing or abuse.    It will further be observed that the cursing
is not directly and personally of him.    The language used is:
"God damn it, get off."

Whilst, therefore, this passes any limits to be embraced in the
word "brusqueness," it must nevertheless be kept in mind that
the plaintiff does not seem to have been greatly shocked by what
occurred; that he himself says it was all in a low tone of voice;
that he could have suffered no humiliation from any one hav-
ing heard the language, since he testified that nobody did hear
it; and, in short, it is not to be gathered from his testimony that
he sustained any great shock by reason of the manner of his ex-
pulsion as related by himself; and yet, on this shadowy case the
jury actually awarded a verdict of $2,500 against the appellant.
No such verdict can be permitted to stand on a case so shadowy
and unsubstantial as this record discloses.    Accepting the plain-
tiff's own testimony, it is plain that he sustained no great in-
jury, that he did not suffer any shock, and that he endured no
humiliation; and whilst the language was in a manner insulting,
and whilst the manner of the expulsion may be said to have been
willful, it was nevertheless, according to his own testimony, so
quietly managed that he himself seems not to have had his feel-
ings greatly ruffled, or to have been in any way humiliated by the
consciousness that others than himself and the brakeman knew
anything about the language used towards him.    There must
be some protection for railroad and other corporations against
verdicts that are manifestly induced, as this one was, by passion
and prejudice.    They must be held to the strictest accountabil-
ity within the law.    They must be made fully and thoroughly
to protect their passengers; but they must, at the same time, be
accorded justice and fairness in the courts of the country.

In view, therefore, of the nature of the case as disclosed by

the plaintiff himself, we think $750 is the utmost amount that should have been allowed to stand. If the appellee will remit down to that sum, the judgment will be affirmed; if not, it will be reversed, and the cause remanded.

*Reversed.*